IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

MID-CITIES BONE AND JOINT §
SURGEONS, P.A. §
　　　　　　　　　　　　　　　§
VS. 　　　　　　　　　　　　　§　　ACTION NO. 4:06-CV-689-Y
　　　　　　　　　　　　　　　§
GE HEALTHCARE DIAGNOSTIC 　　　§
IMAGING and GENERAL ELECTRIC §
CAPITAL CORPORATION 　　　　　 §

ORDER PARTIALLY GRANTING MOTION FOR SUMMARY JUDGMENT

Pending before the Court is the Motion for Summary Judgment [doc. 39] filed by defendant GE Healthcare Diagnostic Imaging ("GE"). After review of the motion, related briefs, evidence highlighted therein, and the applicable law, the Court concludes that the motion should be and hereby is PARTIALLY GRANTED.

I. Facts

Plaintiff Mid-Cities Bone and Joint Surgeons, P.A. ("Mid-Cities") is a professional association that provides health-care services, including orthopedic services, to the public. In 2003, Mid-Cities began negotiations with GE regarding the acquisition of one or more diagnostic imaging systems. One of GE's account executives, Justin Wells, provided several quotations to Mid-Cities for different types of imaging equipment, including the GoldSeal E-Scan XQ MRI system that Mid-Cities ultimately leased. This MRI system was preowned and refurbished. GE's marketing materials stated, in part, that the "GE GoldSeal Preferred offers your best value in refurbished, pre-owned GE medical imaging equipment." (Joint Pretrial Order [doc. 75] at

6, ¶ 3.)

Mid-Cities's administrator, Charles Wiggins, negotiated terms on behalf of Mid-Cities. Wiggins understood that the equipment was refurbished. Wells provided Wiggins with a quote for the equipment of $370,000 with an additional service package priced at $140,000. Wiggins rejected that offer, but ultimately accepted Wells's offer of $360,000 for the equipment with no additional service package. That quotation included a one-year warranty, which Wiggins reviewed prior to entering into the parties' agreement. One of Mid-Cities's principals, Dr. Edward Smith, also participated in reviewing the transaction documents and making decisions regarding the equipment. The lease-purchase agreement was entered into in June 2004, and the equipment was installed on Mid-Cities's premises in late September 2004. In July 2005, shortly before the one-year warranty expired, the parties executed a thirteen-month extended-service agreement at a cost of $8,000.

Soon after Mid-Cities began using the MRI, it had trouble with the quality of the images produced by the equipment. Mid-Cities contends that the equipment functioned properly only between fifty and seventy percent of the time. In March 2006, Mid-Cities ceased using the equipment and referred all of its patients to other healthcare providers for MRIs.

Mid-Cities sues GE, alleging that GE engaged in several false, misleading, and deceptive acts in violation of the Texas Deceptive Trade Practices--Consumer Protection Act, TEX. BUS. & COMM. CODE ANN. § 17.46(b) (Vernon 2008) ("DTPA"), when it induced Mid-Cities to enter

both the original agreement and the extended-service agreement. Mid-Cities also contends that the MRI's defective performance and GE's inadequate repair services constituted a breach of express and implied warranties made to Mid-Cities by GE. Finally, Mid-Cities contends that it entered into the thirteen-month extended-service agreement only because GE caused it economic duress. GE seeks a summary judgment as to all of Mid-Cities's claims.

## II. Summary-Judgment Standard

Summary judgment is appropriate when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party moving for summary judgment has the initial burden of demonstrating that it is entitled to a summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party need not produce evidence showing the absence of an issue of fact with respect to an issue on which the nonmovant bears the burden of proof, however. Rather, the moving party need only point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmovant's claim. *See id.* at 323-25.

When the moving party has carried its summary-judgment burden, the nonmovant must go beyond the pleadings and by its own affidavits or by the depositions, answers to interrogatories, or admissions on file set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e). This burden is not satisfied with

some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions or by only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

In making its determination on the motion, the Court must look at the full record in the case. FED. R. CIV. P. 56(c); *see Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992). Instead, parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

### III. Analysis

#### A. The DTPA's "Laundry List"

##### 1. Section 17.46(b)(2)

A seller violates DTPA section 17.46(b)(2) by "causing confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services." TEX. BUS. & COMM. CODE ANN. § 17.46(b)(2)(Vernon Supp. 2008). This section "is primarily concerned with deception in the origin or endorsement of a good or service." *Prairie Cattle Co. v. Fletcher*, 610 S.W. 2d 849, 853 (Tex. Civ. App.--

Amarillo 1980, writ dism'd).  Mid-Cities contends that GE "caused confusion or misunderstanding as to the source or endorsement of the services provided and the necessity of the additional service agreement [GE] sold to [Mid-Cities] in July 2005."  (Mid-Cities's Resp. Br. [doc. 53] at 2.)

Regarding its claim that GE misrepresented the source or endorsement of the services it provided, Mid-Cities complains about the manner in which GE attempted to fix the problems Mid-Cities was having with the equipment, including whether GE was providing it with "'expert' service for the [e]quipment."  (Mid-Cities Resp. Br. [doc. 53] at 4.)  As for the additional service agreement, Mid-Cities contends that Wells told Wiggins that "if [Mid-Cities] did not enter into the additional service agreement, [GE] would no longer provide support for the [e]quipment."  (Mid-Cities Resp. Br. [doc. 53] at 4-5.)  These complaints do not, however, constitute statements remedied by this section of the DTPA.  They simply are not representations causing confusion or misunderstanding about the origin or endorsement of goods or services.  Furthermore, even assuming Wells's comment that GE "was having experts look at [the MRI system]," (Mid-Cities's App. [doc. 52] at 57-58), could be construed as a comment about the source of services being provided, Mid-Cities has simply failed to highlight any evidence demonstrating that the statement caused confusion or misunderstanding.  Thus, the Court agrees with GE that summary judgment should be granted in its favor on this claim.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT - Page 5
TRM/chr

## 2. Section 17.46(b)(5) and (7)

Section 17.46(b)(5) of the DTPA makes actionable any representations "that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have." TEX. BUS. & COMM. CODE ANN. § 17.46(b)(5) (Vernon Supp. 2008). Section 17.46(b)(7) makes actionable false representations "that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model." *Id.* § 17.46(b)(7). Mid-Cities complains that GE "made very specific representations about the [e]quipment, including that it was 'Same-as-New,' had an uptime guarantee of 95 to 97 percent, and that it was the proper fit for [Mid-Cities's] practice." (Mid-Cities's Resp. Br. [doc. 53] at 8.)

Initially, the Court notes that Mid-Cities has failed to present any evidence demonstrating that GE represented that the equipment was same as new; indeed, the evidence submitted shows that Wiggins knew the equipment was refurbished. Furthermore, Mid-Cities admits that it was **the warranty**, not the equipment, that GE touted as same-as-new, (Mid-Cities Resp. Br. [doc. 53] at 6), and there is no evidence that this representation was false.

More problematic for Mid-Cities, however, is the fact that most of these statements clearly constitute statements of opinion or "mere puffing," which are not actionable under these sections of the DTPA. *See Helena Chem. Co v. Wilkins*, 47 S.W.3d 486, 502 (Tex. 2001); *Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 462 (Tex. App.--Dallas 1990, writ denied). In determining whether a statement is one of opinion or puffing, courts look at the specificity of the statement,

the comparative knowledge of the parties, and whether the representation relates to a future event or condition. *See Autohaus*, 794 S.W.2d at 462-64. "Imprecise or vague representations constitute mere opinions." *Id.* at 462. Such representations are not actionable because they fail "to provide a standard for the jury to use to measure the accuracy of the representation." *Bradford v. Vento*, 48 S.W.3d 749, 759. The "same as new" and "best fit" representations about which Mid-Cities complains are undoubtedly statements of opinion and puffing that are simply not actionable under the DTPA.

The alleged up-time guaranty, however, is more troubling. Wiggins initially testified that Wells guaranteed an uptime of "well over ninety percent," then, when asked for more specificity, testified that the statement was "95 percent or better, something like that." (Mid-Cities's App. [doc. 52] at 60.) An email sent by Wells after the lease-purchase agreement was entered refers to GE's "uptime guarantee of 97%." (*Id.* at 77.) These alleged statements are more specific than the other two statements about which Mid-Cities complains, and Wells certainly had more knowledge about the accuracy of the statements than Wiggins. Although the alleged statements are forward looking, the Court simply is not convinced, at this juncture of these proceedings, that the statements fall into the category of mere puffing. As a result, summary judgment is denied regarding statements about the alleged up-time guaranty.

### 3. Section 17.46(b)(9)

DTPA section 17.46(b)(9) prohibits "advertising goods or services with intent not to sell them as advertised." TEX. BUS. & COMM. CODE

ANN. § 17.46(b)(9) (Vernon 2008). The primary purpose of this section "is the prevention of 'bait advertising,' a practice by which a seller seeks to attract customers through advertising products at low prices which he does not intend to sell in more than nominal amounts." *Smith v. Baldwin*, 611 S.W. 2d 611, 615 (Tex. 1980). There is absolutely no evidence that GE engaged in any bait advertising. Mid-Cities's complaint about the "same as new" and "best value" representations made in GE's written literature miss the mark if for no other reason than the fact that Mid-Cities has presented no evidence tending to demonstrate that those representations were not entirely accurate. Nor has Mid-Cities shown that GE intended at the time the representations were made not to provide Mid-Cities with goods or services of that character. Mid-Cities' complaint about GE's alleged misrepresentation in obtaining Mid-Cities's consent to the 2005 extended-service agreement (i.e. that GE would quit servicing the equipment without an extended-service agreement) simply does not fall within the protection afforded by this subsection. Mid-Cities has failed to point to any advertisement involved in the negotiation of the extended-service agreement. *See id.* at 614-15 (defining "advertise").

  4. Section 17.46(b)(12) and (20)

  Sections 17.46(b)(12) makes actionable any representation that an agreement "confers or involves rights, remedies, or obligations which it does not have or involve." TEX. BUS. & COMM. CODE ANN. 17.46(b)(12) (Vernon Supp. 2008). Section 17.46(b)(20) does the same as to guarantees or warranties. As allegedly violative of these sections, Mid-Cities again points to GE's assurance that the

"[e]quipment would be 'Same-as-New,'" (Mid-Cities's Resp. Br. [doc. 53] at 10), and also to GE's literature regarding its high-quality service and value. Again, there simply is no evidence demonstrating that GE touted its equipment as same as new. And, the representations regarding GE's service and value do not constitute representations about the rights, remedies, or obligations contained in the parties' agreement and warranties.

### 5. Section 17.46(b)(13)

This section prohibits "knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service." Mid-Cities contends that GE violated this subsection by representing that it would not continue to service the MRI system unless Mid-Cities entered into the 2005 extended-service agreement. GE's requiring the extended-service agreement allegedly was unlawful due to the fact that GE was legally required to continue repairing parts of the MRI system that malfunctioned during the one-year warranty period.

The Court questions whether this type of representation is remediable under this subsection, which appears to deal with false representations that repairs are necessary when in fact they are not. In any event, Mid-Cities's argument fails because the evidence simply does not support it. The only evidence Mid-Cities highlights regarding GE's representation about the need for the extended-service agreement is a conversation in which Wells told Wiggins that "without having the agreement, [GE] just wouldn't be coming out to support the system anymore." (Mid-Cities's Resp. Br. [doc. 53] at 11 (citing

Mid-Cities's App. [doc. 52] at 59).) Not continuing to support the system, however, is different from ceasing to make repairs to problems encountered with the equipment during the one-year warranty. Wiggins knew Mid-Cities had a one-year warranty on the equipment and that it would need to purchase an extended-service agreement if it wanted GE to continue servicing the equipment after that year expired. (GE's App. at 59-60.) There is no evidence that Wells ever indicated that GE would refuse to finish repairing problems to the MRI system that first arose during the warranty period. Wiggins's apparent misinterpretation of Wells's statement simply does not give rise to a DTPA claim.

    6.   Section 17.46(b)(24)

This section provides a remedy where a seller fails "to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed." TEX. BUS. & COMM. CODE ANN. § 17.46(b)(24) (Vernon Supp. 2008). Mid-Cities again complains about Wells's statement to Wiggins about GE's ceasing to service the equipment at the end of the one-year warranty period. There simply is no evidence, however, tending to demonstrate that by failing to specifically inform GE that Mid-Cities would continue to repair the equipment to remedy problems that occurred during the warranty period, GE intended to induce Mid-Cities into entering into the extended-service agreement. Mid-Cities also contends that GE failed to produce information about the history of

the MRI system and where it had previously been used. Inasmuch as Mid-Cities knew that the equipment was refurbished, used equipment, it is not apparent to the Court how information about its prior use is relevant. In any event, there is no evidence that GE intentionally withheld such information or that Mid-Cities would not have entered into the parties' agreements had it known the history of the MRI equipment's use.

B. DTPA Breach of Warranty

The DTPA makes actionable any breach of an express or implied warranty that is a producing cause of economic damage to a consumer. TEX. BUS. & COMM. CODE ANN. § 17.50(a)(2) (Vernon 2008). Mid-Cities contends that "[t]he failure of the MRI equipment to function as warranted constitutes a breach of Defendant's express warranties, as well as a breach of implied warranties of merchantability and fitness for a particular purpose." (Joint Pretrial Order [doc. 75] at 2, ¶ 2.) Mid-Cities also alleges that GE breached an implied duty to "perform modification/repair services in a good and workmanlike manner." (Id.) GE responds that Mid-Cities disclaimed all express and implied warranties and that, even assuming the "good-and-workmanlike-manner warranty" applies to the facts of this case, Mid-Cities has not presented sufficient evidence to demonstrate that the warranty was breached.

Regarding warranties, the parties' agreement provides as follows:[1]

---

[1] GE submitted in its appendix the parties' lease agreement, (GE App. at 104-107), but also submitted a three-page excerpt regarding "Warranties," (GE App. at 84-86), and a two-page excerpt of "Standard Conditions of Quotation for

**Scope and Duration of Warranties**

Product Warranties: We warrant to you that the GE . . . products listed in our Quotation (the "Products") will be free from defects in materials and workmanship.

. . . .

The warranty period shall be 12 months . . . .

**Warranty Exclusions**
These warranties are exclusive and in lieu of all other warranties, whether written, oral, expressed, implied, or statutory. NO EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE APPLIES.

. . . .

**Exclusive Warranty Remedies**

Product Warranties: If you promptly notify us of your warranty claims and make the Product available for service, we will[,] at our option, repair, adjust, or replace (with new or exchange replacement parts) the non-conforming Product or parts of the Product. . . .

. . . .

The above describes your exclusive remedies and our sole liability for any warranty claims. You agree that we and our representatives have no liability to you for (1) any penal, incidental or consequential damages such as lost profit or revenue, (2) any assistance not required under our Quotation, or (3) anything occurring after the warranty period ends.

(GE's App. [doc. 39] at 84.)

In order to give rise to a DTPA cause of action, the warranty alleged to have been breached must have been created or established independently of the DTPA; the DTPA does not create warranties. *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 438 (Tex. 1995). Express warranties are created by agreement of the parties to a contract,

---

MR Products," (GE App. at 83), that it contends were part of the agreement. Mid-Cities has not disputed that these documents are part of the parties' agreement.

and implied warranties are derived from statute or common law.  *See La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W. 2d 558, 565 (Tex. 1984).  Because claims for breach of warranty derive from common-law principles or other statutory provisions, a disclaimer of warranties that is valid under those provisions or principles is also valid for DTPA purposes.  *See Sw. Bell Tel. Co. v. FDP Corp.*, 811 S.W. 2d 572, 576-77 (Tex. 1991).

Warranties generally may be excluded or modified "if they are in writing and conspicuous." *Singleton v. LaCoure*, 712 S.W. 2d 757, 759 (Tex. App.--Houston [14th Dist.] 1986, writ ref'd n.r.e.).  A clause is "conspicuous when 'it is so written that a reasonable person against whom it is to operate ought to have noticed it.'"  *Id.* (quoting TEX. BUS. & COMM. CODE ANN. § 1.201(10)).  The parties' agreement clearly and unequivocally disclaims any warranties except as stated therein, including--in all capital letters--any "express or implied warranty of merchantability or fitness for a particular purpose." (GE's App. [doc. 39] at 84.)  Thus, the only warranty Mid-Cities received was the express warranty made in the parties' agreement--that the products would be free from defects in materials and workmanship for a period of twelve months.

Mid-Cities urges that this express warranty is exactly what it contends was breached.  And, Mid-Cities has presented evidence tending to demonstrate that although GE attempted repairs to the equipment on several occasions, the equipment continued to malfunction.  Indeed, Mid-Cities estimates that the equipment functioned properly only somewhere between fifty to seventy percent of the time.

GE contends that Mid-Cities' remedies for a breach of the express warranty are limited, however, because the parties' agreement contains a limitation-of-remedies provision. That provision limits Mid-Cities to the repair, adjustment, or replacement of the equipment, at GE's option, if the equipment does not perform as expressly warranted. (GE's App. at 84.) It is entirely unclear, however, that GE ever adequately repaired or adjusted the equipment, and there is no evidence that it was ever replaced. Furthermore, the Court notes that the "Standard Conditions of Quotation for MR Products" provides that "the total liability of GE . . . and your exclusive remedy relating to the quotation and the products listed in it is limited to the price stated in the quotation for the product or service which is the basis for the claim." (GE App. at 83.) As a result, GE has failed to demonstrate that summary-judgment is proper on the breach-of-express-warranty claim.

Mid-Cities additionally urges that GE breached the implied warranty that repairs be made in a good and workmanlike manner. The Texas Supreme Court has held that such a warranty is available to consumers suing under the DTPA and that it may not be waived or disclaimed. *See Melody Home Mfg. Co. v. Barnes*, 741 S.W. 2d 349, 354 & 355 (Tex. 1987). The court defined "good and workmanlike as that quality of work performed by one who has the knowledge, training, or experience necessary for the successful practice of a trade or occupation and performed in a manner generally considered proficient by those capable of judging such work." *Id.* at 354. The court further noted that "[w]e do not require repairmen to guarantee the

*results* of their work; we only require those who repair or modify existing tangible goods or property to *perform* those services in a good and workmanlike manner." *Id.* at 355. "Expert testimony is often required to support such a claim, but it is not required if the breach . . . is plainly within the common knowledge of laymen." *U.S. Marine Corp. v. Kline*, 882 S.W. 2d 597, 600 (Tex. App.--Houston [1st Dist] 1994, no writ).

In this case, Mid-Cities has not pointed the Court to any expert testimony demonstrating that the repairs to the MRI machine made by GE were accomplished in an unworkmanlike manner. The operation of an MRI machine--and whether repairs made thereto were performed in a good and workmanlike manner--simply is not within the common knowledge of laymen. Mid-Cities urges the Court to accept circumstantial evidence on this point, noting that it used the machine correctly but continued to have problems with it even after GE attempted to make repairs. But, "[t]he failure to repair, standing alone, is no evidence that the work was not done in a good and workmanlike manner." *Id.* at 600. "This is not a case like *Melody Home*, where anybody could tell the repairs were shoddy. In *Melody Home,* water pipes were left unconnected, flooding the home. In this case, no evidence, expert or otherwise, showed the repairs were done negligently." *Id.* at 601.

## C. Unconscionable Acts Under the DTPA

The DTPA also makes actionable "any unconscionable action or course of action by any person" that results in economic damage to a consumer. TEX. BUS. & COMM. CODE ANN. § 17.50(a)(3). Mid-Cities's

allegations in the complaint and joint pretrial order regarding unconscionable conduct appear to be more of an afterthought, however, inasmuch as they consist of less than one full sentence. (Am. Compl. at 7, ¶ 16 (in section titled "BREACH OF EXPRESS AND IMPLIED WARRANTIES," alleging simply that "the machine's defective performance and the inadequate repair services . . . constitute an unconscionable act or course of action [under the DTPA]"); Joint Pretrial Order at 2, ¶ 2 (same).) Unsurprisingly, GE seeks summary judgment on this claim as well.

Under the DTPA, "'[u]nconscionable action or course of action' means an act or practice [that], to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COMM. CODE ANN. § 17.45(5) (Vernon Supp. 2008). "To prove an unconscionable action or course of action, a plaintiff must show that the defendant's acts took advantage of h[is] lack of knowledge and 'that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated.'" *Ins. Co. of N. Am. v. Morris*, 981 S.W. 2d 667, 677 (Tex. 1998) (quoting *Chastain v. Koonce*, 700 S.W. 2d 579, 583 (Tex. 1985)).

Here, Mid-Cities has simply failed to come forward with the type of evidence required to sustain a claim of unconscionable action under the DTPA. Mid-Cities points out that it had never purchased or leased similar equipment before and relied upon GE's cost-benefit analysis regarding the MRI equipment and its recommendation about the equipment. Mid-Cities has failed to point to any evidence, however,

demonstrating that the analysis and/or recommendation were inaccurate at the time they were made. No evidence has been presented tending to demonstrate that GE took advantage of Mid-Cities's lack of knowledge or that the resulting unfairness was glaringly noticeable. Mid-Cities also again points to its contention that Wells told Wiggins GE would cease to support the equipment entirely unless it agreed to an extended-service contract. As noted earlier, however, the evidence in support of that alleged statement is not nearly as damning as Mid-Cities suggests, and in any event certainly does not reflect that GE took advantage of Mid-Cities's inferior position to such a degree that the unfairness is glaringly noticeable.

D. Economic Duress

Mid-Cities also contends that GE engaged in economic duress by threatening to cease servicing the equipment if Mid-Cities did not enter into an extended-service agreement. In Texas, "[e]conomic duress requires: (1) a threat to do something which a party threatening has no legal right to do; (2) some illegal exaction or some fraud or deception; and (3) imminent restraint such as to destroy free agency without present means of protection." *Brown v. Cain Chem., Inc.*, 837 S.W. 2d 239, 244 (Tex. App.--Houston [1st Dist.] 1992, writ denied). The duress must result from "threats which render persons incapable of exercising their free agency and which destroy the power to withhold consent." *Sudan v. Sudan*, 199 S.W. 3d 291, 292 (Tex. 2006). There simply is no evidence rising to the level of economic duress; there is no indication that Mid-Cities did not have the opportunity to consult with an attorney regarding the

necessity of entering into the extended-service agreement prior to doing so. *See id.*

## IV. Conclusion

For the foregoing reasons, the Court concludes that GE's Motion for Summary Judgment should be and hereby is PARTIALLY GRANTED, in that summary judgment is granted in GE'S favor on all of Mid-Cities's claims except: (1) the claim brought under DTPA section 17.46(b)(5) and (7) regarding the alleged uptime guaranty; and (2) the breach-of-express-warranty claim under DTPA section 17.50(a)(2).

SIGNED September 22, 2008.

_/s/ Terry R. Means_
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE